UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
No. 24-CV-380

| | |
|---|---|
| C.M., *a minor, through his parents*, LEAH McGHEE AND CHAD McGHEE,<br><br>Plaintiff,<br><br>v.<br><br>DAVIDSON COUNTY BOARD OF EDUCATION; *and* ERIC R. ANDERSON, *in his individual capacity*,<br><br>Defendants. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND MONETARY DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.       C.M. is a 16-year-old boy formerly enrolled as a high school sophomore at Central Davidson High School, a public school in Lexington, North Carolina (the "School"). The School is in the district that is governed by the Davidson County Board of Education (the "Board").

2.       Last month, during his English class, C.M. sought clarification about the word "aliens" during a vocabulary lesson. C.M. raised his hand and asked his teacher whether a reference to "aliens" during a class discussion referred to "space aliens or illegal aliens who need green cards."

Case 1:24-cv-00380   Document 1   Filed 05/07/24   Page 1 of 28

3. The School punished C.M. for his question with three days out-of-school suspension—a punishment described by the administration as "harsh." In issuing that punishment for his comment, the School baldly concluded that C.M.'s question was "racially insensitive" and a "racially motivated comment which disrupts class."

4. But the School had no legal justification for harshly punishing C.M. Aside from the obvious fact that his words had nothing to do with race, his speech was protected under the First Amendment: he asked his teacher a question that was factual and nonthreatening, and officials could not have reasonably forecast that his question would cause substantial School disruption. Nor did his question actually cause substantial School disruption.

5. In harshly punishing C.M., the School engaged in viewpoint discrimination based entirely on its own subjective—and incorrect—viewpoint that the racially neutral phrase "illegal aliens" was somehow indicative of racial discrimination.

6. The viewpoint discrimination is evident from the School's decision to not harshly punish another student who made a comment threatening violence against C.M.—a comment that, on its face, is far more disruptive to the learning environment. It is further evidenced from a School administrator's assertion that harsh punishment was necessary to avoid

2

being "unfair" to students who received the same punishment "for saying the N word"—a preposterous comparison.

7. The School also deprived C.M. of due process by denying him the ability to appeal the suspension.

8. This lawsuit seeks to vindicate C.M.'s Free Speech and Due Process rights under the First and Fourteenth Amendments of the U.S. Constitution, as well as his rights under the North Carolina Constitution.

## **PARTIES**

9. Plaintiff C.M. is a 16-year-old boy who lives in Lexington, North Carolina. He brings this suit through his parents and legal guardians, Leah McGhee and Chad McGhee.

10. Defendant Davidson County Board of Education is the governing body responsible for establishing policies for all students enrolled in member schools in the district, which includes the School where C.M. attended.[1] The Board is located at 250 County School Road, Lexington, North Carolina

---

[1] *See* https://www.davidson.k12.nc.us/apps/pages/index.jsp?uREC_ID=797270&type=d&p REC_ID=1188016.

27292 and may be served with process by serving its Chairperson, Alan Beck.[2]

11.     Defendant Eric R. Anderson is the Assistant Principal at the School. Anderson is being sued in his individual capacity, and he may be served with process at the School located at 2747 NC Hwy. 47, Lexington, North Carolina 27292.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. This case raises federal claims arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendments of the U.S. Constitution, as well as state-law *Corum* claims under the North Carolina Constitution. Plaintiff's claims for declaratory and injunctive relief are pursuant to 28 U.S.C. §§ 2201 and 2202, Federal Rules of Civil Procedure 57 and 65, and the general legal and equitable powers of this Court.

13.     Venue is appropriate under 28 U.S.C. § 1391(b) because Defendants' offices are located in this judicial district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

---

[2] *See* https://www.davidson.k12.nc.us/apps/pages/index.jsp?uREC_ID=797270&type=d&pREC_ID=1188026.

Case 1:24-cv-00380   Document 1   Filed 05/07/24   Page 4 of 28

## FACTUAL ALLEGATIONS

### *The Board's 2023-2024 Student Handbook*

14.     The Board issues a Student Handbook to all students. Attached as **Exhibit 1** is a copy of the Student Handbook that C.M. received for the current 2023-2024 academic school year.

15.     The Student Handbook discusses "disruption" and states:

> **DISRUPTION OF SCHOOL (Policy 6.11.1 Rule 1)** Students are prohibited from disrupting teaching, the orderly conduct of school activities, or any other lawful function of the school or school district.

*See* **Exhibit 1**, Student Handbook, p. 16.

16.     The Student Handbook then depicts "conduct [that] is illustrative of disruptive behavior" that the Board and School prohibit. *Id*.

17.     None of the illustrative conduct identified in that section of the Student Handbook could reasonably lead a student to think that making a comment in class that includes the words, "alien" or "illegal alien" or "green cards" would be characterized as "disruptive behavior." *See id*.

18.     Next, the Student Handbook discusses "civility" and states in relevant part:

> **INTEGRITY AND CIVILITY (Policy 6.11.1 Rule 10)** In addition to any standards or rules established by the schools, the following behaviors are in violation of the standards of integrity and civility and are specifically prohibited:

5

> ● students shall not use profanity, obscenity, fighting or abusive words, or otherwise engage in speech that disrupts (written, symbolic or verbal) and/or materially and substantially disrupts the classroom or other school activities.
>
> Nothing herein is intended to limit a student's right to express his or her thoughts and opinions at reasonable times and places, consistent with the protections of the First Amendment. In general, schools may place restrictions on a student's right to free speech when the speech is obscene, abusive, promoting illegal drug use, or is reasonably expected to cause a substantial disruption to the school day.

*Id.* at p. 22-23.

19.     None of the illustrative conduct identified in that section of the Student Handbook could reasonably lead a student to think that an in-class comment including the words, "alien" or "illegal alien" or "green cards" would be characterized as insufficiently "civil" or as profane, obscene, fighting words, abusive words, or otherwise reasonably expected to cause substantial disruption to a school day. *Id.*

### C.M.'s Question to His English Teacher

20.     On April 9, 2024, C.M. received permission to go to the restroom during his English class from his teacher, Ms. Haley Hill. While away from class, C.M. missed part of Ms. Hill's vocabulary lesson.

21.     Upon his return to English class, the word "aliens" was used during class discussion. C.M. raised his hand and asked Ms. Hill whether the reference to aliens referred to "space aliens or illegal aliens who need green cards." Hill responded and said, "Watch your mouth [C.M.]."

22.     R., a Hispanic male student in C.M.'s class, joked that he was going to "kick [C.M.]'s ass."

23.     Class otherwise proceeded as normal.

24.     C.M.'s question about whether "aliens" referred to "space aliens or illegal aliens who need green cards" was not racially motivated or targeted at anyone—including Hill, R., or any of his classmates.

25.     Nor could C.M.'s question reasonably be viewed as obscene, fighting words or abusive, or promoting illegal drug use. He did not intend— and could not reasonably foresee—that his question would cause substantial disruption to class, nor did he intend to substantially disrupt the School's educational process or mission by asking Hill a question about an in-class reference to the word "aliens."

26.     Rather, C.M. simply asked his teacher a question about a word— "alien"—that he did not introduce into the class discussion, and which he had heard on the news and could find in a dictionary. And it is C.M.'s view and understanding that anyone from any other country, who is not a U.S. citizen

and wishes to be a lawful permanent resident of the United States, must obtain a green card, regardless of the person's race.

27. C.M. is unaware of any Board policy, or any provision of the School Handbook, forbidding students from saying the words, "alien" or "illegal alien" or "green cards."

28. Prior to his comment, neither Ms. Hill nor Assistant Principal Anderson nor any other teacher or School official advised C.M. that he could not say in class the words "alien" or "illegal alien" or "green cards." And prior to his comment, neither Ms. Hill nor Assistant Principal Anderson nor any other teacher or School official advised C.M. that the Board and School view the words, "alien" or "illegal alien" or "green cards" as being racially insensitive or abusive.

### *The Assistant Principal Meets with C.M. and R.*

29. Following English class, C.M. and R. were pulled out of lunch and asked to go to Assistant Principal Anderson's office.

30. Mr. Anderson spoke first to R. When R. said that he was not offended, Mr. Anderson disagreed and told R. that C.M.'s words "were a big deal," effectively telling R. that he should have been offended.

31. Then Anderson spoke to C.M. and said that R. was "upset," "crying," and "offended." C.M. did not find these assertions believable because

8

he could see that R. was not upset. But C.M. listened to Assistant Principal Anderson and told his side of the story. Mr. Anderson would later recall telling C.M. that it would have been more "respectful" for C.M. to phrase his question by referring to "those people" who "need a green card."

32.     C.M. and R. have a good relationship. R. confided in C.M. that he was not "crying" in his meeting with Anderson, nor was he "upset" or "offended" by C.M.'s question. R. said, "If anyone is racist, it is [Mr. Anderson] since he asked me why my Spanish grade is so low"—an apparent reference to R.'s ethnicity.

### The School Suspends C.M. for His Speech

33.     That day, Assistant Principal Anderson, on behalf of the School, suspended C.M. for three days out of school for "making a racially insensitive remark that caused a class disturbance." Attached as **Exhibit 2** is a copy of the Suspension Notification suspending C.M. that was issued by Assistant Principal Anderson on behalf of the School.[3]

---

[3] Because he is a minor, C.M.'s full name has been redacted in the Suspension Notification filed as **Exhibit 2** with the Court in accordance with the Rules, which require redaction of certain personal identifiers. *See* Fed. R. Civ. P. 5.2(a).

9

34. C.M. later learned that R. received only a brief in-school suspension for his joking comment in Hill's English class that he was going to "kick [C.M.]'s ass."[4]

35. The Suspension Notification further stated that C.M. violated Board Policy "6.11 Using/Making racially motivated comment which disrupts class." *Id.*

36. In the detailed description section of the School's Suspension Notification, it says that "[C.M.] made a racially insensitive comment, in class today, about an alien 'needing a green card.'" And directly under this section, Assistant Principal Anderson signed his name. *Id.*

37. The Notification further says: **"There shall be no right to an appeal of the principal's decision to impose a short term suspension (10 days or less) to the Superintendent or Board of Education."** *Id.* (emphasis in original). Nevertheless, C.M.'s parents attempted to appeal the suspension through their communication with School and Board officials.

38. When C.M.'s parents met with Assistant Principal Anderson in the hope of appealing the suspension, Anderson seemed to blame Ms. Hill for

---

[4] To be clear, C.M. is not advocating for punishment against R., nor did C.M. view R.'s comment as an actual threat. But this discrepancy in treatment of the two in-class comments underscore the obvious nature of the School's decision to punish C.M. for its own incomprehensibly sensitive viewpoints about the phrase "illegal aliens."

10

any purported disruption, saying that she has "struggled" with classroom management as a result of "being so young and being a female."

39.     Anderson further explained that it is the School and Board's practice and custom since August of 2023 to mete out "harsh" punishment anytime there is something said that's racially insensitive. He declared that reversing C.M.'s suspension would be "unfair to the 15 other kids who have served [suspension] for saying the N word or anything else under the sun that's racially charged that creates a disruption in the classroom."

40.     The Board upheld Assistant Principal Anderson's decision to suspend C.M. from School for making a racially motivated and insensitive comment that disrupts class in violation of Board Policy 6.11.

41.     For example, after Anderson's decision to suspend C.M. from School for his comment in class, C.M.'s parents asked School and Board officials to reverse his suspension and permanently remove from his record the Suspension Notification for violation of Board Policy 6.11, but they refused to do either.

42.     And C.M.'s parents also asked School and Board officials to remove from his record the unexcused absences as a result of the suspension as well as any reference to C.M.'s comment being "racially" motivated or insensitive in violation of Board Policy 6.11, but they refused to do so.

43.     C.M.'s mother, Leah McGhee, sent two emails on April 12, 2024, to Board Chairman Beck and Board member Nick Jarvis, attached hereto as **Exhibit 3**. Chairman Beck and Board member Jarvis have never responded to these emails.

### *The Board's Authority over the School and Board Policy 6.11*

44.     The Board's policies may be found on its public website.[5]

45.     The Board has control and authority over all public schools in Davidson County, including the School. *See* Board Policy 1.1. In accordance with North Carolina law, the Board is required to provide C.M. with a "sound basic education." *See* Board Policy 1.1 at ¶ 1; *Leandro v. State*, 488 S.E. 2d 249, 255 (N.C. 1997) (holding that the state constitution "guarantee[s] every child of this state an opportunity to receive a sound basic education in [the] public schools.").

46.     This control by the Board includes authority over all matters pertaining to the School in accordance with state law. *See* Board Policy 1.1.

---

[5] *See* https://www.davidson.k12.nc.us/apps/pages/index.jsp?uREC_ID=917649&type=d&pREC_ID=1257087.

Board Policy 6.11 regarding "Disruption of School" is attached as **Exhibit 4**.[6] It does not prevent students from using in class the words "alien," "illegal alien," or "green cards." *See id*. Nor does Board Policy 6.11 state that the use of such words by a student in class is considered racially insensitive or abusive. *See id*.

### *"Alien," "Illegal Alien," and "Green Cards" Are Commonly Used Words*

47.    "Alien," "illegal alien," and "green cards" are common terms that appear in both state and federal law.

48.    The current U.S. Immigration and Naturalization Act enacted by Congress defines the term "alien," which "means any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).

49.    The North Carolina General Assembly enacted an entire chapter devoted exclusively to "aliens," Chapter 64, Article I, entitled, "Various Provisions Related to Aliens." *See* N.C. Gen. Stat. §§ 64-1 – 64-24.

50.    *Black's Law Dictionary* defines "alien" as: "Someone who resides within the borders of a country but is not a citizen or subject of that country; a person not owing allegiance to a particular country. In the United States,

---

[6] There appear to be 14 subrules contained within Board Policy 6.11. When clicking on the main Board Policy 6.11 link highlighted in bold on the public website, it generates the first subrule, Rule 1 on "Disruption of School," which is being submitted with the Court as **Exhibit 4**. *See supra*, n. 5 at 6.11.

an alien is a person who was born outside the jurisdiction of the United States, who is subject to some foreign government, and who has not been naturalized under U.S. law." ALIEN, Black's Law Dictionary (11th ed. 2019).

51. The *Oxford English Dictionary* defines "alien" as: "A person who does not belong to a particular family, community, country, etc.; a foreigner, a stranger, an outsider." *Oxford English Dictionary*, s.v. "alien (n.), sense 1.a," March 2024.

52. That same dictionary defines "illegal alien" as: "A person who is not legally authorized to live or work in their country of residence; *cf*. illegal immigrant n." *Oxford English Dictionary*, s.v. "illegal alien (n.)," December 2023.

53. The official Government website of the U. S. Citizenship and Immigration Services contains the federal statutory definition of "alien" in its glossary of terms and further notes: "This term may include a stateless person and is synonymous with 'noncitizen' and 'foreign national.'"[7]

54. And highly prominent jurists with diverse cultural and ethnic backgrounds have used the same words in their written opinions that C.M. used in Hill's English class at the School.

---

[7] *Available* at:
https://www.uscis.gov/tools/glossary#:~:text=secretary%20of%20Labor.-,Alien,%E2%80%9D%20and%20%E2%80%9Cforeign%20national.%E2%80%9D.

14

55.     For example, Judge James Ho of the Fifth Circuit Court of Appeals, who was born in Taiwan and immigrated to the United States as a child, has written: "There's no need to be offended by the word 'alien.' It's a centuries-old legal term found in countless judicial decisions." *Khan v. Garland*, 69 F. 4th 265, 271-72 (5th Cir. 2023) (Ho, J., concurring).

56.     One of those "countless judicial decisions" that Judge Ho referenced was written by the late Supreme Court Justice Thurgood Marshall. He began a majority opinion as follows: "In this case, we must determine whether an ***alien*** who is prosecuted under 8 U.S.C. § 1326 for ***illegal*** entry following deportation may assert in that criminal proceeding the invalidity of the underlying deportation order." *United States v. Mendoza-Lopez*, 481 U.S. 828, 830 (1987) (Marshall, J.) (emphasis added).

57.      Opinions issued by the U.S. Supreme Court less than a month before C.M.'s suspension use the terms "green card" and "illegal aliens." *See Wilkinson v. Garland*, 144 S. Ct. 780, 785 (2024) (Sotomayor, J.) (using the term "green card" to refer to immigrants with "lawful permanent residence"); *id.* at 794 (Alito., J., dissenting, joined by Roberts, C.J. and Thomas, J.) (using the term "illegal aliens" consistent with the United States Code).

### *C.M.'s Injury*

58.     This was C.M.'s first year (2023-2024) as a student at the School.

15

59.     He was a member of the track team and hopes to earn a track scholarship to attend college.

60.     After C.M. served his detention, he was not allowed to compete in the Senior night home track meet—the most important meet of the year. The School's track coach said, "I have heard some things about you."

61.     C.M. has received threats and been bullied and harassed as a result of the School's suspension and labeling of his comment in Ms. Hill's English class as racially motivated and insensitive. Those threats escalated significantly after the story became widespread.

62.     On April 29, 2024, in response to the threats and the hostility of the administration, C.M.'s parents unenrolled him from School and enrolled him in a certified homeschool program in another area of North Carolina away from Davidson County.

63.     In other words, but for Board Policy 6.11, and the manner in which it was enforced to wrongly label C.M.'s comment as racially motivated and insensitive, C.M. would still be enrolled as a student at the School.

64.     C.M. is currently in the process of looking at various colleges and starting the application process, as he is finishing his sophomore year of high school and will be a rising junior—the usual time when students begin applying to colleges.

65. According to the policy language directed to C.M.'s parents in the School's Suspension Notification, C.M. is unable to appeal Assistant Principal Anderson's decision to suspend him from School.

66. The School's charge that C.M.'s comment in class was racially motivated and insensitive in violation of Board Policy 6.11 that the Board upheld, and the Suspension Notification placed in his record could seriously damage his standing with classmates, teachers, and coaches, as well as negatively impact and interfere with C.M.'s opportunities for higher education, earning a track scholarship, and his future employment and earning capacity.

67. But C.M. is not a racist nor were his words racially motivated or insensitive.

68. Instead, C.M.'s comment in Hill's English class was protected speech under the First Amendment because there was no substantial disruption in class or to School activities and functions following his comment. Nor would School officials reasonably forecast substantial disruption at School following his comment.

69. C.M.'s comment and the words he used were factual and nonthreatening.

70.      Indeed, C.M. used the same words in Hill's English class at School that have been used by Congress, the North Carolina General Assembly, Supreme Court justices, and countless other state and federal judges and officials.

## CLAIMS FOR RELIEF

**COUNT ONE**
**(Against the Board and Anderson)**
**42 U.S.C. § 1983 - First Amendment Free Speech**
**C.M.'s use of "alien" or "illegal alien" or "green cards" in class is protected speech because they are factual, nonthreatening words that did not cause substantial disruption in class or to School activities and functions**

71.      C.M. incorporates the preceding paragraphs by reference.

72.      The U.S. Supreme Court held 55 years ago that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

73.      Under the *Tinker* framework, for school officials to regulate student speech, they must articulate facts that might reasonably have led officials to forecast that the speech would cause substantial disruption or material interference with school activities; or show that substantial disruption took place on a school's premises. *See id.* at 514.

18

74.     *Tinker* "requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." *Newsom ex rel. Newsom v. Albemarle Cnty. School Bd.*, 354 F.3d 249, 255 (4th Cir. 2003) (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 211 (3d Cir. 2001) (Alito, J.)).

75.     "The First Amendment does not permit schools to prohibit students from engaging in [] factual, nonthreatening speech." *Starbuck v. Williamsburg James City County School Bd.,* 28 F.4th 529, 536-37 (4th Cir. 2022).

76.     Here, the Board and Assistant Principal Anderson deprived C.M. of his First Amendment Free Speech rights under the U.S. Constitution when Anderson executed and enforced Board Policy 6.11 as set forth in the Suspension Notification, suspending C.M. for three days, out of school, for his comment in class.

77.     Further, the Board ratified Anderson's decision to suspend C.M. from School pursuant to Board Policy 6.11 for his comment in class, by upholding C.M.'s suspension, refusing to reverse it, and failing to remove from his record the Suspension Notification and reference to C.M.'s comment being "racist" following his parents' request to School and Board officials.

78.     Moreover, as Assistant Principal Anderson explained to C.M.'s parents, the School and Board maintain a widespread and well-settled

19

practice and custom that constitutes standard operating procedure, which deprives students of their First Amendment free speech rights.

79.  Anderson said, "*Anytime* there is something said that's racially insensitive," the School and Board's practice and custom is to mete out harsh punishment and suspension. In other words, their practice and custom fails to take into consideration whether a student's speech *actually causes* a substantial disruption at School or may reasonably be forecast by officials to lead to substantial School disruption.

80.  This practice and custom that constitutes standard operating procedure completely ignores *Tinker's* "substantial disruption" test.

81.  And the Suspension Notification fails to show "substantial disruption" of Hill's English class under *Tinker's* required minimum threshold. *See* 393 U.S. at 514.

82.  Indeed, the Suspension Notification does not reflect substantial disruption or material interference in Hill's class as a result of C.M.'s comment.

83.  Nor does the Suspension Notification reflect that Assistant Principal Anderson forecast substantial disruption to School activities and functions following C.M.'s comment in class.

Case 1:24-cv-00380   Document 1   Filed 05/07/24   Page 20 of 28

84.     *First*, the Suspension Notification does not show that C.M.'s comment in class materially interfered with a classmate's right—including R.'s right—to receive a sound basic education in accordance with North Carolina law. *See* **Exhibit 2**; Board Policy 1.1 at ¶ 1; *Leandro*, 488 S.E. 2d at 255.

85.     *Second*, the Suspension Notification does not show that C.M.'s comment in class materially interfered with Ms. Hill's ability to discharge her duties under North Carolina law to deliver a sound basic education to her students—including R. *See* **Exhibit 2**; Board Policy 1.1 at ¶ 1; *Leandro*, 488 S.E. 2d at 255.

86.     *Third*, the words C.M. used in class as set forth in the Suspension Notification are factual, nonthreatening words, and the School may not prohibit C.M. from engaging in "factual, nonthreatening speech." *See Starbuck,* 28 F.4th at 536-37.

87.     Because the Board and Assistant Principal Anderson deprived C.M. of his First Amendment Free Speech rights, C.M. is entitled, *inter alia*, to a preliminary and permanent injunction ordering the Board to remove the Suspension Notification from his record. C.M. is further entitled to monetary damages against both the Board and Anderson for their deprivation of his First Amendment Free Speech rights.

88.     It was clearly established law within this judicial district on April 9, 2024, that the School could not prevent C.M. from engaging in factual, nonthreatening speech that did not substantially disrupt or materially interfere with Hill's English class or School activities and functions. *Tinker*, 393 U.S. at 503; *Starbuck,* 28 F.4th at 536-37. Thus, Assistant Principal Anderson is not entitled to qualified immunity.

**COUNT TWO**
**(Against the Board)**
**42 U.S.C. § 1983 - First and Fourteenth Amendments**
**The Board's student speech policies are unduly vague because C.M. must guess at what words the Board deems "racially insensitive," and there is no due process afforded to appeal the suspension**

89.     C.M. incorporates the preceding paragraphs by reference.

90.     "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures—Boards of Education not excepted." *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 637 (1943).

91.     In *Baggett v. Bullitt*, the Supreme Court invalidated certain statutory provisions "because their language [was] unduly vague, uncertain, and broad." 377 U.S. 360, 366 (1964).

92.     In that case, the Court focused on the inherent ambiguities in the term "subversive" and noted such language gave individuals very little guidance as to what speech and activities were prohibited. *Id*.

22

93.     Nearly a century ago, the Supreme Court held a law is unconstitutionally vague "when people of common intelligence must necessarily guess at its meaning." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

94.     The void-for-vagueness doctrine is applicable in challenges to laws, ordinances, rules, policies, and statutes under both the First and Fourteenth Amendments to the Constitution.

95.     In *City of Chicago v. Morales*, the Supreme Court invalidated a law on due process vagueness grounds. *See generally* 527 U.S. 41 (1999).

96.     Due process challenges are about basic fairness and notice: reasonable people should not have to "guess" at the meaning of a statute or rule as to what behavior is permitted and what is prohibited. *See Connally*, 269 U.S. at 391.

97.     "Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him," the minimal requirements of the Due Process Clause must be satisfied. *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *Board of Regents v. Roth*, 480 U.S. 564, 573 (1972).

98.     Here, C.M. maintains a liberty interest in his good name and reputation, as well as a property interest in his guaranteed right to a sound

Case 1:24-cv-00380   Document 1   Filed 05/07/24   Page 23 of 28

basic education. *See Goss*, 419 U.S. at 572-74; Board Policy 1.1 at ¶ 1;
*Leandro*, 488 S.E. 2d at 255.

99. But the Board's policies on student speech are unduly vague and deprive C.M. of his rights under the First and Fourteenth Amendments because the policies provide no advance notice to students on what speech in class is permitted or prohibited, and there is no opportunity for a hearing to appeal a short-term suspension.

100. C.M. must guess at the meaning of the Board's speech policies and whether his use in class of the words, "alien," "illegal alien," and "green cards" is permitted or prohibited. *See Connally*, 269 U.S. at 391. The Board's policy, practice, and custom in regulating words that it subjectively deems to be "racially insensitive" is ambiguous and gives students like C.M. very little guidance as to what they may say in class. *See Baggett v. Bullitt* 377 U.S. at 366. In other words, the Board's imposition of punishment onto students for their "racially insensitive" speech has no standards.

101. The Board's policies further provide no opportunity for a hearing for C.M. to challenge his three days out-of-school suspension issued by the School. The Supreme Court has recognized that a permanent stain on a student's record—like the Suspension Notification charging C.M. with making a racially insensitive remark that is currently in his record—"could

24

seriously damage [a student's] standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *See Goss*, 419 U.S. at 575.

102. Because the Board deprived C.M. of his fundamental liberty and property interests under the First and Fourteenth Amendments, C.M. is entitled, *inter alia*, to a preliminary and permanent injunction ordering the Board to remove the Suspension Notification from his record. C.M. is further entitled to monetary damages.

**COUNT THREE**
**(Against the Board)**
**North Carolina State Constitution – Right to Damages**
**C.M. is entitled to damages under the state constitution for the Board's violations of his rights to free speech, education, and due process**

103. C.M. incorporates the preceding paragraphs by reference.

104. The North Carolina Supreme Court has recognized a direct claim under the North Carolina Constitution, called a *Corum* claim, to recover compensation for a violation of a state constitutional right for which there is no common law or statutory remedy, or where such remedy is inaccessible to the plaintiff. *See Corum v. Univ. of N.C.,* 413 S.E.2d 276, 289 (N.C. 1992)*; see also Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 678 S.E.2d 351, 355 (N.C. 2009).

25

105.     To prevail on a *Corum* claim, the plaintiff must establish that (1) his state constitutional rights have been violated, and (2) he otherwise lacks an "adequate state remedy." *Taylor v. Wake Cty*., 811 S.E.2d 648, 652 (N.C. Ct. App. 2019).

106.     In *Corum*, the Supreme Court of North Carolina held that a professor who had been dismissed for exercising his right to free speech, had a direct claim against the University of North Carolina because sovereign immunity was inapplicable. 413 S.E.2d at 276.

107.     The Board's actions caused harm to C.M. that cannot be redressed by equitable relief alone. When C.M. was suspended and his comment in class branded by the School as "racially insensitive," causing him to miss School and move to another school (homeschool), he was deprived of his rights to free speech, education, and due process under the North Carolina constitution. C.M. has suffered reputational harms and received threats as a result of the Board's actions.

108.     Thus, C.M. is entitled to monetary damages against the Board under his supplemental state law *Corum* claim.

26

## **PRAYER FOR RELIEF**

Plaintiff C.M. respectfully requests that the Court grant relief as follows:

A. Under Counts I and II, preliminary and permanent injunctions ordering the Board to (a) reverse his School suspension, (b) remove the Suspension Notification from his record, (c) remove unexcused absences from his record as a result of the suspension, (d) remove all references from his record that he used "racially" motivated, inappropriate, or insensitive language in class, and (e) a public apology acknowledging that his comment in class was not "racially" motivated, inappropriate, or insensitive;

B. Under Counts I and II, declare the Board's student speech policies unconstitutional under the First and Fourteenth Amendments;

C. Under Count I, award monetary damages against the Board and Assistant Principal Anderson individually in an amount to be determined at trial;

D. Under Counts II and III, award monetary damages against the Board in an amount to be determined at trial;

E. Award attorneys' fees and costs to Plaintiff C.M. as a prevailing party under Counts I and II pursuant to 42 U.S.C. § 1988; and

F. Award Plaintiff all further relief that the Court deems just, proper, or

Case 1:24-cv-00380   Document 1   Filed 05/07/24   Page 27 of 28

equitable.

Dated:  May 7, 2024

/s/ Troy D. Shelton
Troy D. Shelton
N.C. State Bar No. 48070
tshelton@dowlingfirm.com
Craig D. Schauer
N.C. State Bar No. 41571
cshelton@dowlingfirm.com
DOWLING PLLC
3801 Lake Boone Trail, Suite 260
Raleigh, North Carolina 27607
Telephone: (919) 529-3351


M.E. Buck Dougherty III*
Dean McGee*
James McQuaid*
LIBERTY JUSTICE CENTER
440 N. Wells Street, Suite 200
Chicago, Illinois 60654
(312) 637-2280 - telephone
bdougherty@libertyjusticecenter.org
dmcgee@libertyjusticecenter.org
jmcquaid@libertyjusticecenter.org

*Pro hac vice admission forthcoming*

*Attorneys for Plaintiff C. M.*

28